FILED
United States Court of Appeals
Tenth Circuit

November 15, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

THE ESTATE OF CLAYTON LOCKETT, by and through its personal representative Gary Lockett,

Plaintiff - Appellant,

v.

GOVERNOR MARY FALLIN, in her individual capacity; ROBERT C. PATTON, in his individual capacity; ANITA TRAMMELL, in her individual capacity; DOCTOR JOHN DOE,

Defendants - Appellees.

No. 15-6134

------------------------------

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA; DOCTORS FOR THE ETHICAL PRACTICE OF MEDICINE: DR. LUCAS RESTREPO, Clinical Assistant Professor of Neurology at the University of California, DR. STEVEN MILES, Professor of Medicine and Bioethics at the University of Minnesota Medical School in Minneapolis, DR. ROBERT L. COHEN, Clinical Assistant Professor of Medicine, NYU; Member, New York City Board of Correction, DR. JOHN P. MAY, Regional Medical Director of Florida Region for Wexford Health Sources, and Consultant on Correctional Healthcare to the U.S. Department of Justice, Civil Rights Division; DR. MARC

STERN, Affiliate Assistant Professor, Health Services at the University of Washington, formerly the Health Services Director for the Washington State Department of Corrections; DR. SCOTT ALLEN, Professor of Medicine, Associate Dean of Academic Affairs, University of California Riverside School of Medicine; DR. JOSIAH D. RICH, Professor of Medicine and Epidemiology, Brown University and Director of the Center for Prisoner Health and Human Rights; DR. ROBERT GREIFINGER, Professor (Adjunct) of Health and Criminal Justice and Distinguished Research Fellow at John Jay College of Criminal Justice in New York City and correctional health care policy and quality management consultant; DR. COLEMAN PRATT, Chief Medical Officer, Health Center in Florida, former Medical Director for Prison Health Services; DR. DAVID NICHOLL, Consultant Neurologist at Sandwell and West Birmingham Hospital, UK; DR. JOHN HENNING SCHUMANN, Gussman Family Associate Professor of Medicine, University of Oklahoma-Tulsa,

Amici Curiae.

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:14-CV-01119-HE)**

---

Alan Chen, University of Denver, Sturm College of Law, Denver, Colorado (David A. Lane and Amy Kapoor, Kilmer, Lane & Newman, LLP, Denver, Colorado, and Justin F. Marceau, University of Denver, Sturm College of Law, Denver, Colorado, with him on the briefs), for Plaintiff-Appellant.

Aaron J. Stewart (Richard Mann, with him on the brief), Assistant Attorneys General, Oklahoma Attorney General's Office, Litigation Division, Oklahoma City, Oklahoma, for Mary Fallin, Robert Patton and Anita Trammell, Defendants-Appellees.

David W. Lee (Stephen L. Geries, with him on the brief), Collins Zorn & Wagner, P.C., Oklahoma City, Oklahoma, with him on the brief), for Doctor John Doe, Defendant-Appellee.

Ryan D. Kiesel, and Brady R. Henderson, American Civil Liberties Union of Oklahoma Foundation, Oklahoma City, Oklahoma, A. Katherine Toomey, Lewis Baach PLLC, Washington, D.C., filed Amici Curiae briefs.

---

Before **GORSUCH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

The Estate of Clayton Lockett, through its personal representative Gary Lockett, filed suit against Mary Fallin, Governor of Oklahoma, in her individual capacity; Robert Patton, Director of the Department of Corrections of Oklahoma, in his individual capacity; Anita Trammell, Warden of the Oklahoma State Penitentiary, in her individual capacity; Dr. Doe, in his official and individual capacities; John Doe EMT, in his individual capacity; three John Doe executioners, in their individual capacities; two John Doe drug manufacturers, in their individual and official capacities; and two John Doe compounding pharmacies,[1] in their individual and

---

[1] Lockett's Estate has abandoned his claims against the compounding pharmacies because Appellees assert that no compounded drugs were used in Lockett's execution. *See* Appellees' Resp. Br. at 26; Appellant's Reply Br. at 6 n.5. Thus, we have not recited the facts relating to compounding pharmacies.

official capacities. The Estate asserts several constitutional violations related to Lockett's execution. We affirm the district court's dismissal of the case.

## I. Facts[2]

In 1999, Lockett kidnapped, assaulted, and killed nineteen-year-old Stephanie Neiman. Lockett shot young Ms. Neiman with a shotgun and then had an accomplice bury her alive. In 2000, a jury found Clayton Lockett guilty of 19 felonies arising from the same incident, including the murder, rape, forcible sodomy, kidnapping, and assault and battery of Ms. Neiman. The jury recommended that the court impose the death penalty on Lockett's murder conviction.

From 1990 to 2010, as detailed in Oklahoma's Field Memorandum, a manual setting execution procedures, Oklahoma used a common drug protocol previously administered in at least 93 Oklahoma executions. Under this protocol, Oklahoma administered three drugs—the first, sodium thiopental, to render the condemned inmate unconscious; the second, pancuronium bromide, to paralyze the inmate; and

---

[2] Because this appeal is from a motion to dismiss, we accept as true all facts as sufficiently alleged in the complaint. *Georgacarakos v. United States*, 420 F.3d 1185, 1186 (10th Cir. 2005). This standard, while deferential, does not require us to accept hyperbole or legal conclusions as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (citations omitted) (alteration in original)). The Amended Complaint leaves unmentioned many facts a reader might be curious to know. But we are limited to the facts set out in the Amended Complaint. In Lockett's Estate's briefing to this court, it asks us to take judicial notice of news articles that add facts to those in the Amended Complaint. As discussed below, we decline this invitation and thus recite only those facts that appear in the Amended Complaint.

the third, potassium chloride, to induce cardiac arrest and stop the inmate's heart. In 2010, facing difficulty obtaining sodium thiopental, Oklahoma officials amended the Field Memorandum to substitute in its place pentobarbital.[3]

On March 21, 2014, Oklahoma officials again amended the Field Memorandum to allow a number of new alternate procedures for use in executions by lethal injection. As one of these new procedures, officials substituted midazolam as the first drug used in the protocol. Before Lockett's execution, Oklahoma had not used midazolam during an execution. Warden Trammell and Director Patton chose this new protocol. Neither of them had any independent medical training.

On April 1, 2014, Warden Trammell and Director Patton notified Lockett that he would be executed using midazolam, pancuronium bromide, and potassium chloride, with the first two drugs being manufactured by a compounding pharmacy.[4] On April 4, 2014, they notified Lockett that the midazolam would not in fact be from a compounding pharmacy. On April 11, 2014, they notified Lockett that vecuronium bromide would be used instead of pancuronium bromide.

On April 14, 2014, Warden Trammell and Director Patton amended the Field Memorandum's execution procedures by increasing the concentration of midazolam

---

[3] The problems States have had in procuring execution drugs are widely known. *See, e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726, 2733–34 (describing the unavailability of execution drugs that led to Oklahoma using midazolam).

[4] Compounding pharmacies produce drugs specifically tailored to the individual patient.

from 50mg/100ml to 50mg/10ml, a tenfold increase. Thus, Warden Trammell and Director Patton did not notify Lockett of the final drug protocol until April 14, 2014 (15 days before his execution). On April 25, 2014, Oklahoma officials again amended the Field Memorandum, but the Amended Complaint does not specify what changed, simply noting that the change was made "with an addendum." Appellant's App. vol. 1 at 160. When Lockett was executed, the Field Memorandum did not require a backup IV line, a visible and uncovered IV line, or continuous observation of the IV insertion site. Nor did it require that backup dosages of the drugs be available or that the personnel involved in the execution have any specific level of training.

Ultimately, Lockett was executed under one of the Field Memorandum's newly amended protocols: 100mg of midazolam (to render Lockett unconscious),[5] 40mg of vecuronium bromide (to paralyze Lockett), and 200 milliequivalents of potassium chloride (to stop Lockett's heart). Until Lockett's execution, no State had ever used that protocol. Unless the dosage of midazolam renders the prisoner

[5] Lockett's Estate alleges that midazolam is ineffective in this role. *See* Appellant's App. vol. 1 at 164–65. But we do not need to accept this as a fact. Asserting that midazolam is ineffective in rendering an inmate unconscious essentially asserts that the use of midazolam is constitutionally deficient, a legal conclusion that we need not credit. *Cf. Zink v. Lombardi*, 783 F.3d 1089, 1102 (8th Cir. 2015) (noting that the court did not need to accept speculative facts on the potential deficiencies in compounded pentobarbital as an execution drug because the complaint did not show that the lethal-injection protocol was "sure or very likely" to create a substantial risk of severe pain (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality opinion))).

unconscious, the second and third drugs will cause immense pain. Vecuronium bromide will asphyxiate the prisoner, and potassium chloride will cause "burning and intense pain" until death follows cardiac arrest. *Id.* at 163–64.

On April 29, 2014, Oklahoma brought Lockett to the execution chamber, and Dr. Doe[6] and the EMT ultimately selected a vein in his groin area as the injection site.[7] To shield any view of Lockett's naked groin from witnesses in the execution chamber, someone placed a cloth over the injection site. After Dr. Doe and the EMT placed the IV, prison officials raised the curtain separating the viewing area from the execution chamber.

At 6:23 p.m., the executioners administered the first drug, midazolam. At 6:33 p.m., Lockett was declared unconscious. After this, the executioners administered the second drug (vecuronium bromide) and the third drug (potassium chloride). Unexpectedly, at 6:36 p.m., Lockett began "twitching and convulsing" on the table. *Id.* at 152. At 6:37 p.m., he tried to rise from the table but was able only to raise his head and say, "Oh, man," and "I'm not . . . ." *Id.* According to some observers, Lockett also said, "something's wrong." *Id.* Soon afterward, Lockett "began to buck and writhe, as if he was trying to raise himself from the gurney[,] . . . [and he] next

[6] We note that the State withdrew its motion to maintain the seal on Dr. Doe's name imposed by the district court. But Lockett's Estate and Amici have failed to provide sealed copies of the complaint and other documents to this court, instead submitting only redacted copies. Thus, nowhere does Dr. Doe's real name appear in our record. We will continue to use the pseudonym throughout.

[7] The Amended Complaint does not reveal what Dr. Doe's assigned duties were before he entered the execution chamber.

tried to raise his head and shoulders away from th[e] gurney [while] clench[ing] his teeth and grimac[ing] in pain." *Id.* at 160.

In response, Dr. Doe examined the IV site and saw that the injection vein had collapsed, preventing some of the drugs from reaching Lockett's circulatory system. Responding to a question from Director Patton, Dr. Doe advised him that he believed insufficient drugs had entered Lockett's system to cause death. Dr. Doe also told Director Patton that no other vein was available and that insufficient drugs remained to complete the execution even if Dr. Doe could find another vein. Dr. Doe did not consider or was unaware that the State had a second set of the execution drugs available to execute condemned prisoner Charles Warner later that night. As events soon proved, Dr. Doe was mistaken that the drugs in Lockett's system might not cause death. At 7:06 p.m., Dr. Doe declared Lockett dead, 43 minutes after the executioners administered the first drug. In the 19 Oklahoma executions preceding Lockett's execution, doctors had pronounced the condemned prisoner dead between 6 and 12 minutes (as we understand it, from administering the first drug).

The Amended Complaint alleges that the autopsy report says the "execution was halted" at 6:56 p.m., 33 minutes after Lockett was injected with the midazolam (not saying who halted it or how). *Id.* at 153. A later report noted that "an IV insertion problem" prevented at least some of the drugs from entering Lockett's system. *Id.* No one knows how much of each drug entered Lockett's system. The report concluded that the cloth over Lockett's groin, which blocked the execution

team's view of the IV insertion site, was the "major reason" for the problems with the execution. *Id.* at 174.

In its Amended Complaint, Lockett's Estate alleges seven claims: (1) "Eighth Amendment violation—Torture," against all defendants, *id.* at 161; (2) "Eighth Amendment—Using Untested Drugs and Human Medical Experimentation," against all defendants, *id.* at 163; (3) "Eighth Amendment—Use of Compounded Drugs in Human Medical Experimentation," against all defendants, *id.* at 166; (4) "Eighth Amendment—Human Medical Experimentation on Unwilling Prisoners," against all defendants, *id.* at 168; (5) "Eighth Amendment—Failure to Train and Supervise," against Warden Trammell and Director Patton, *id.* at 172; (6) Fourteenth Amendment—"Failure to Protect State-Created Rights Procedural Due Process Violation," against all defendants, *id.* at 176; and (7) "Sixth Amendment Right to Counsel and First Amendment Access to the Court Violation," against Warden Trammell and Director Patton, *id.* at 177.

In response, Governor Fallin, Director Patton, and Warden Trammell filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), as did Dr. Doe. Both motions asserted qualified immunity among other defenses. The district court granted both motions to dismiss on qualified-immunity grounds and sua sponte dismissed the claims against the other Doe defendants.[8] The district court reasoned that Lockett's

[8] These Doe defendants were the EMT, executioners, compounding pharmacies, and drug manufacturers. Plaintiff never identified them by name (or, so far as we can tell, served them with process).

Estate had failed to show that the defendants had violated clearly established law. We agree. Thus, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II. Analysis

We review de novo a district court's grant of a motion to dismiss. *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.* at 555. But we need not accept legal conclusions contained in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Qualified Immunity

All Appellees claim that they are entitled to qualified immunity. Qualified immunity protects government officials from suit, not just from liability. *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). "In resolving a motion to dismiss based on qualified immunity, a court must consider whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011)). When determining whether qualified immunity applies, we may choose "which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223,

236 (2009). Although Lockett's Estate urges us to decide each of the constitutional-violation questions first, we decline to do so.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson*, 555 U.S. at 231). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations and quotation marks omitted). It is undisputed that qualified immunity "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); *McInerney v. King*, 791 F.3d 1224, 1236–37 (10th Cir. 2015) ("For a right to be clearly established there must be a Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent."). In the Tenth Circuit, "[w]e have . . . adopted a sliding scale to determine when law is clearly established. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quotation marks

omitted). Clearly established law should "not [be] define[d] . . . at a high level of generality." *Al-Kidd*, 536 U.S. at 742. Thus, "broad history and purposes of the Fourth Amendment" was an insufficient basis for a finding of clearly established law in *al-Kidd*. *Id.* (quotation marks omitted).

**1. Dr. Doe's Qualified Immunity**

Lockett's Estate argues that Dr. Doe is not entitled to qualified immunity. Because Dr. Doe is a private party, rather than a government employee, we must add an additional step to his qualified-immunity analysis. For private parties, courts "look both to history and to the purposes that underlie government employee immunity" to determine whether qualified immunity applies. *Richardson v. McKnight*, 521 U.S. 399, 404 (1997). *Richardson* held that qualified immunity does not apply to private prison officials. In so holding, the Court "found no conclusive evidence of a historical tradition of immunity for private parties carrying out" prison-management activities. *Id.* at 407. In evaluating whether qualified immunity was warranted by the purposes of governmental immunity, the Court found it relevant that a private prison is subject to competitive market pressures. *Id.* at 409.

> Earlier precedent described immunity as protecting the public from unwarranted timidity on the part of public officials by, for example, encouraging the vigorous exercise of official authority, by contributing to principled and fearless decision-making, and by responding to the concern that threatened liability would, in Judge Hand's words, "dampen the ardour of all but the most resolute, or the most irresponsible," public officials.

*Id.* at 408 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)) (quotation marks and citations omitted). Qualified immunity's purpose lies in "protecting

'government's ability to perform its traditional functions' by providing immunity where 'necessary to preserve' the ability of government officials 'to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.'" *Id.* at 407–08 (quoting *Wyatt v. Cole*, 504 U.S. 158, 167 (1992)). Qualified immunity for private individuals is, as Lockett's Estate points out, fact-specific.

More recently, in *Filarsky v. Delia*, 132 S. Ct. 1657 (2012), the Court characterized *Richardson* as "a self-consciously 'narrow[]' decision." *Filarsky*, 132 S. Ct. at 1667 (alteration in original) (quoting *Richardson*, 521 U.S. at 413). In *Filarsky*, the Court concluded that an attorney who was temporarily retained by a city to assist in investigating potential wrongdoing was entitled to qualified immunity, partly because "[t]here is no dispute that government employees performing such work are entitled to seek the protection of qualified immunity" and because "[t]he common law . . . did not draw such distinctions [between permanent, full-time government employees and temporary ones like the retained attorney], and we see no justification for doing so under § 1983." *Id.* at 1667–68.

Dr. Doe is entitled to assert qualified immunity because the purposes of qualified immunity support its application here: carrying out criminal penalties is unquestionably a traditional function of government, exactly the sort of activities that *Richardson* reasoned qualified immunity was meant to protect. If participants in an execution could be held liable for problems during the execution, that would necessarily implicate *Filarsky*'s concerns about "[t]he public interest in ensuring

performance of government duties free from the distractions that can accompany even routine lawsuits," which the Court noted "is also implicated when individuals other than permanent government employees discharge these duties." *Filarsky*, 132 S. Ct. at 1666. The attorney in *Filarsky* received qualified immunity largely because a permanent government attorney doing the same acts would receive it. The *Filarsky* Court determined that denying a temporarily retained attorney the same defense as a full-time government attorney would undermine the purposes of the doctrine. The same is true here—for instance, had a state employee performed the same duties as Dr. Doe did here, qualified immunity would apply. We see no sense in depriving a private doctor the same protection. Here, Dr. Doe stands in the same position as the attorney in *Filarsky*—he was a private party hired to do a job for which a permanent government employee would have received qualified immunity. Thus, we conclude that qualified immunity applies to Dr. Doe.

**2. Torture and Deliberate Indifference**

In its Amended Complaint, Lockett's Estate labels its first claim for relief as "Eighth Amendment violation—Torture." Appellant's App. vol. 1 at 161. And that claim indeed repeatedly references torture and asserts that "Clayton Lockett had a right under the Eighth Amendment to not be tortured to death by the Defendants." *Id.* at 163. In the midst of the torture allegations, though, we see that this claim makes a single isolated reference to deliberate indifference: "The Defendants have acted with deliberate indifference to the risk of torture being inflicted on Clayton Lockett." *Id.* at 162. At oral argument, we questioned whether this pleading language limits

Lockett's Estate's claims here to a torture claim rather than its broader appellate claim that Defendants were deliberately indifferent to Lockett's suffering during the execution. Oral Argument 7:58–9:05; Appellant's Opening Br. at 21. In response to the panel's expressed doubts, Lockett's Estate has submitted a Fed. R. App. P. 28(j) letter arguing that the deliberate-indifference claim was "fairly included in the Amended Complaint's factual allegations." Rule 28(j) Letter at 1.

While "[g]enerally, failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim," *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (quoting *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1121 (10th Cir. 2005)), "[i]f the new theory prejudices the other party in maintaining its defense . . . courts will not permit the plaintiff to change her theory," *id.* (citing *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006)). Although Lockett's Estate's first claim needs some stretching to raise a deliberate-indifference claim rather than a claim solely for torture, we will do so. Importantly, we note that Appellees have alleged no prejudice from this liberal construction.

Lockett's Estate alleges that Appellees violated Lockett's clearly established right to be free from cruel and unusual punishment. But in its analysis, Lockett's Estate does not account for how cruel-and-unusual-punishment claims operate in the execution context. A good starting place in our analysis is to recognize—as did the *Baze* plurality—that because capital punishment is constitutional, lawful means must exist to carry it out. *Baze*, 553 U.S. at 47 (citing *Gregg v. Georgia*, 428 U.S. 153, 177

(1976)). And in evaluating alternative execution methods, we must further recognize that "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." *Id.* Simply put, the Eighth Amendment does not require "the avoidance of all risk of pain in carrying out executions." *Id.* The *Baze* Court cited cases disallowing under the Eighth Amendment "punishments of torture . . . and all others in the same line of unnecessary cruelty." *Id.* at 48 (quoting *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879)). By this measure, the *Baze* Court meant "the deliberate infliction of pain for the sake of pain—'superadd[ing]' pain to the death sentence through torture and the like." *Id.* (alteration in original). This view tracks *In re Kemmler*, 136 U.S. 436 (1890), where the Court concludes that "[p]unishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, —something more than the mere extinguishment of life." *Id.* at 447; *see Baze*, 553 U.S. at 48–49 (discussing *In re Kemmler*).

The Supreme Court's death-penalty opinions recognize that executions can go awry. Thus, the *Baze* plurality notes that "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50 (quotation marks omitted). As a situation exceeding these bounds, the Court has raised the prospect of a case with "a series of abortive attempts at electrocution": "such a situation—unlike an 'innocent misadventure'—

would demonstrate an 'objectively intolerable risk of harm' that officials may not ignore." *Id.* (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 470 (1947) and *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)) (citations omitted). Ultimately, "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a substantial risk of serious harm." *Id.* (quotation marks omitted).

Everyone acknowledges that Lockett suffered during his execution. But that alone does not make out an Eighth Amendment claim. Here, the Amended Complaint describes exactly the sort of "innocent misadventure" or "isolated mishap" that the *Baze* plurality excuses from the definition of cruel and unusual punishment. *Id.* Thus, Lockett's suffering did not run afoul of the Eighth Amendment. While Lockett's Estate takes issue with the three-drug protocol and the midazolam amount used in Lockett's execution, everyone agrees[9] that Lockett's suffering arose from IV infiltration: the drugs leaked into the surrounding tissue rather than into his bloodstream, keeping Lockett from receiving full doses of the drugs. Nowhere does Lockett's Estate allege that the execution team placed the IV or covered Lockett's groin area *to cause* Lockett pain. Rather, concerns for Lockett's dignity and privacy

[9] *See, e.g.*, Appellant's Reply Br. at 18 ("Defendants knew that once it was clear that the midazolam had not entered Mr. Lockett's body he was not unconscious."); *id.* at 19–20 ("One does not need a medical degree to comprehend that when a condemned prisoner is not successfully rendered unconscious, the administration of paralytic drugs will cause him unbearable, excruciating pain.").

led to the covering and to no one in the execution chamber seeing that not all of the execution drugs had entered Lockett's bloodstream. Any holding that this mistake would convert an otherwise-constitutional execution into an Eighth Amendment violation could not withstand *Baze*'s reasoning, as later reaffirmed in *Glossip v. Gross*, 135 S. Ct. 2726 (2015). Thus, the only clearly established law we have on this topic at least strongly indicates that Lockett's Estate has no claim for torture or deliberate indifference.

**3. Efforts to Establish an IV**

Lockett's Estate argues that repeated attempts to establish an IV before the execution constituted cruel and unusual punishment in violation of the Eighth Amendment. But unlike Lockett's appellate briefing, his Amended Complaint does not allege that he was "repeatedly stab[bed]" with a needle or any of the other facts Lockett's Estate uses to support this claim. Appellant's Opening Br. at 17. The Amended Complaint alleges only that Dr. Doe and the EMT placed the central IV line "despite the ample availability of sites that could have provided peripheral venous-access." Appellant's App. vol. 1 at 173. For supporting facts, Lockett's Estate asks us to take judicial notice of news articles and Justice Sotomayor's dissent in *Glossip* discussing Lockett's execution.

Under the Federal Rules of Evidence, courts may take judicial notice of a fact "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.

201(b). "Care must be taken that the requisite notoriety exists. Every reasonable doubt upon the subject should be resolved promptly in the negative." *Brown v. Piper*, 91 U.S. 37, 43 (1875).

We will not take judicial notice of the news articles to which Lockett's Estate directs us because this is not the appropriate setting for judicial notice. Judicial notice is proper when a fact is beyond debate, for instance, what time the sun sets on a given day. When courts have taken judicial notice of contents of news articles, they have done so for proof that something is publically known, not for the truth of the article's other assertions. *See Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) ("The[ articles] serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."). Here, Lockett's Estate asks us to accept as true the contents of the articles. We decline to do so.

We also will not take judicial notice of the discussion of Lockett's execution in *Glossip*. "On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001) (quoting *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999)).

Based on the facts alleged in the Amended Complaint, nothing supports Lockett's Estate's claim relating to the efforts to establish the IV. Even so, we doubt

that attempting to place an IV for an hour would violate the Eighth Amendment under *Baze*. *See Baze*, 553 U.S. at 55 (finding no violation where the execution protocol allowed the IV team one hour to establish an IV). Regardless, because no factual basis supports this claim, it fails.

**4. Deliberate Indifference to Serious Medical Needs**

Lockett's Estate asserts in its fourth claim that Appellees violated the Eighth Amendment by being deliberately indifferent to "Lockett's serious medical need to not have a lingering death" and "to die as quickly and painlessly as was humanly possible." Appellant's Opening Br. at 21; Appellant's App. vol. 1 at 168. In support of its position that Appellees acted with deliberate indifference to Lockett's serious medical needs, the Estate argues that Appellees "had the ability to administer a fatal dosage and put [Lockett] out of his apparent misery, but made the deliberate and callous decision to not use the available drugs to relieve [him] from his unnecessary and wanton pain." Appellant's Opening Br. at 23.

At the same time, the Estate acknowledges that the EMT and later Dr. Doe had difficulty locating and placing the IV. The Estate recounts that these two people tried but were unable to insert the IV, "all over [Lockett's] body," including in his neck, arms, and feet, before placing it in a vein in Lockett's leg. *Id*. at 17-18. The Estate also states that Dr. Doe, after discovering that the vein had collapsed, advised the director that no other suitable vein was available. *Id*. at 8. So in making this claim, the Estate assumes that Dr. Doe could have readily found another vein for the IV, and that the drugs for Warner's impending execution were nearby to use. The Estate

doesn't argue that Appellees intentionally set the IV to collapse the vein to cause Lockett's suffering. Instead, it argues that Appellees "had no plan to respond, and did nothing to prevent Mr. Lockett from a lingering, tortured death."[10] *Id.* at 23 (citing Appellant's App. vol. 1 at 153-54).

"Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act deliberately and indifferently to serious medical needs of prisoners in their custody." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). "Deliberate indifference has both an objective and subjective component." *Id.* To meet the objective component, "[t]he medical need must be sufficiently serious." *Id.* A medical need is sufficiently serious "if the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). To satisfy the subjective component, the plaintiff must show that the defendant knew that the plaintiff "faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt*, 199 F.3d at 1224 (quoting *Farmer*, 511 U.S. at 847). The substantial-harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).

[10] Though providing no record cite, the Estate also asserts that "[d]espite obvious resistance, John Doe Executioners pushed the drugs into the tissue and muscles." Appellant's Opening Br. at 18.

In resolving this claim, we do not decide the Eighth Amendment issue. Instead, we affirm the district court's decision that Appellees' actions and inactions did not violate a clearly established Eighth Amendment right. The Estate has failed to show "that the official[s] violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *al-Kidd*, 563 U.S. at 735). "And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Id.* at 2023. "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (citation omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quoting *Klen v. City of Loveland, Colo.*, 6641 F.3d 498, 511 (10th Cir. 2011)). But because cases almost never have exactly the same circumstances, we require less that way as conduct becomes more obviously egregious. *Id.* Here, we see no cases announcing clearly established law that the Eighth Amendment commands, in these circumstances, that Appellees hasten Lockett's death more quickly than the 30 minutes it took. Again, as did the district court, we choose to affirm the dismissal of this claim on the clearly-established-law prong.

**5. Prolonged Execution**

Lockett's Estate's fourth claim for deliberate indifference to Lockett's serious medical needs fairly includes a claim for an Eighth Amendment violation based on Lockett's "prolonged, painful, and torturous execution." Appellant's Opening Br. at 1. We now analyze that claim separately. The Supreme Court has determined that, in the execution context, "torture" and "cruel and unusual punishment" require that executing officials *mean* to choose an execution method that will cause extra pain beyond that necessary to carry out the death sentence. *See Baze*, 553 U.S. at 48 (noting that the bar on "torture" bans "the deliberate infliction of pain for the sake of pain—'superadd[ing]' pain to the death sentence through torture and the like"). Although we accept that Lockett's execution was "unnecessarily prolonged and horribly painful," Appellant's Opening Br. at 17, the problems during Lockett's execution fit under *Baze*'s "isolated mishap" exception for events that, "while regrettable, do[] not suggest cruelty, or that the procedure at issue gives rise to a substantial risk of serious harm." *Baze*, 553 U.S. at 50 (quotation marks omitted). Thus, Appellees violated no clearly established law despite Lockett suffering pain during his execution. The IV infiltration was an "isolated mishap," not something designed to cause additional pain. Because Oklahoma has changed its execution protocol to incorporate several procedures *Baze* spoke favorably about,[11] we likely

[11] *See Glossip*, 135 S. Ct. at 2734–35 (noting that Oklahoma now lists four possible drug combinations and has enacted safeguards, including these six: "(1) the insertion of both a primary and backup IV catheter, (2) procedures to confirm the viability of the IV site, (3) the option to postpone an execution if viable IV sites cannot be established within an hour, (4) a mandatory pause between administration

will never confront another Oklahoma execution presenting the same circumstances as Lockett's execution.

**6. New Drug Combination**

Lockett's Estate challenges Oklahoma's using a new drug protocol in Lockett's execution. Lockett's Estate alleges that Appellees should have been on notice that midazolam "could cause unnecessary pain and a lingering death" because the midazolam levels were too low and the Oklahoma Supreme Court had issued a stay due to lack of information about the drug. Appellant's Opening Br. at 25. But this mischaracterizes the Oklahoma Supreme Court's holding, which did not rest its stay on a lack of information about midazolam. Instead, the court held that, because Lockett had no information about the execution drugs, a stay was warranted. *See Lockett v. Evans*, 356 P.3d 58, 59 (Okla. 2014). The Oklahoma Supreme Court lifted the stay two days later when Lockett had been "provided with the identity of the drug or drugs to be used in the execution[] and with the dosages to be injected." *Lockett v. Evans*, 330 P.3d 488, 491 (Okla. 2014). Those opinions did not concern midazolam or midazolam levels.

Additionally, Lockett's Estate fails to state a claim based on the use of uncompounded midazolam; rather, the paragraphs of the Amended Complaint

---

of the first and second drugs, (5) numerous procedures for monitoring the offender's consciousness, including the use of an electrocardiograph and direct observation, and (6) detailed provisions with respect to the training and preparation of the execution team").

Lockett's Estate relies on complain that *compounded* drugs, specifically midazolam, can be impure or lack potency. *See* Appellant's App. vol. 1 at 167; Appellant's Opening Br. at 25. And Lockett's Estate has abandoned claims relating to compounded drugs. *See* Appellant's Reply Br. at 6 n.5.

Even if the Amended Complaint did sufficiently allege that midazolam was a constitutionally unacceptable execution drug, *Glossip* would defeat that argument. In *Glossip*, the Court noted that because capital punishment is constitutional, "'[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" *Glossip*, 135 S. Ct. at 2732–33 (alterations in original) (quoting *Baze*, 553 U.S. at 47). The *Glossip* Court also concluded that the district court had not clearly erred in finding that "sodium thiopental and pentobarbital are now unavailable to Oklahoma's Department of Corrections." *Id.* at 2738. The Court further held that "[t]he District Court did not commit clear error when it found that midazolam is highly likely to render a person unable to feel pain during an execution." *Id.* at 2739. Based on the Court's acknowledgment that states were having difficulties acquiring execution drugs, *see id.* at 2733, we can follow the Court's logic to say that if sodium thiopental and pentobarbital are unavailable, some other method, potentially including a new drug combination, must be constitutional. Oklahoma did not switch to midazolam in an effort to inflict additional pain. Thus, we conclude that Oklahoma's use of midazolam comports with the Eighth Amendment. *See Baze*, 553 U.S. at 103 (Thomas, J., concurring) ("But absent malevolence or a purpose to inflict unnecessary pain, the Court [in *Resweber*] concluded that the Constitution did not

prohibit Louisiana from subjecting the petitioner to [the risks of electrocution] a second time in order to carry out his death sentence." (quotation marks omitted)); *Furman v. Georgia*, 408 U.S. 238, 326 (1972) (Marshall, J., concurring) (noting that the *Resweber* Court held "that the legislature adopted electrocution for a humane purpose, and that its will should not be thwarted because, in its desire to reduce pain and suffering in most cases, it may have inadvertently increased suffering in one particular case"). Thus, any claim based solely on the use of midazolam fails.

**7. Failure to Adequately Train and Supervise Personnel**

Lockett's Estate claims that "Defendants Patton and Trammell did not promulgate the policies necessary to prevent Mr. Lockett from being executed in a way that violated the Eighth Amendment." Appellant's Opening Br. at 27. Lockett's Estate lists eight procedural failures:

> Defendants' [sic] failed to (1) consult with experts, (2) require the attempted placement of a peripheral IV access line before placing a central line, (3) require establishment of a backup IV line, (4) require observation of the IV access site by an execution team member, (5) require a backup dosage of medications, (6) require a specific level of experience and training for personnel, (7) limit their own discretion, and (8) vest ultimate decision-making in someone with medical training or establish other checks and balances.

*Id.* Although Lockett's Estate "does not suggest that there is a 'clearly established' list of the aforementioned requirements of which Defendants should have been aware," it directs us to procedures approved by the *Baze* plurality. *Id.* But *Baze* did not impose those approved procedures as a constitutional floor, so Lockett's Estate cannot prevail simply by noting that Lockett's execution lacked some of those

procedures. And it's worth noting that Oklahoma has now adopted some of these procedural measures. *See Glossip*, 135 S. Ct. at 2753 (noting that Oklahoma now requires a backup IV and monitoring of the IV site, and Oklahoma now sets out "detailed provisions" on the training and preparation of the execution team).

Lockett's Estate claims that "a reasonable officer would have been on notice that the failure to promulgate basic policies to protect against painful, barbaric, and torturous executions violate[s] the Eighth Amendment." Appellant's Opening Br. at 27. But this provides nothing beyond the "high level of generality" that the Supreme Court has concluded will not suffice to show clearly established law. *Al-Kidd*, 563 U.S. at 742. As in *al-Kidd*, where the plaintiff tried to rely on the "broad history and purposes of the Fourth Amendment" as clearly established law, Lockett's Estate's general pronouncement is too broad to show clearly established law. *Id.* (quotation marks omitted).

In addition, in its fifth claim, Lockett's Estate argues that Warden Trammell and Director Patton are liable under the Eighth Amendment for failure to train execution-team members on how to properly carry out an execution. In this regard, it cites *City of Canton v. Harris*, 489 U.S. 378 (1989), which provides § 1983 liability on this basis, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 at 388. Lockett's Estate cites no cases supporting such liability in our context.

Even if we were to accept the *City of Canton* standard here, the claim would fail. Although Oklahoma did not employ every safeguard possible, it did employ

some: for example, a doctor and EMT placed the IV, and a doctor remained present in the execution chamber to declare when Lockett became unconscious. Lockett's execution likely would have gone smoother if Oklahoma had required a backup IV line and required an unobstructed view of the IV site by the medical personnel. But these deficiencies were not so likely to result in a violation of the Eighth Amendment that they amount to deliberate indifference.

Under *Baze*, "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures." *Baze*, 553 U.S. at 60–61. And *Baze* also tells us that "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets" the standard for a stay of execution based on an unconstitutional method of execution. *Id.* at 61. This comment responded to Justice Stevens's concerns that *Baze* might confuse other states. *See id.*; *id.* at 71 (Stevens, J., concurring). Certainly, in *Baze*, Kentucky's protocol bettered Oklahoma's as used here. For instance, Kentucky required a primary and backup IV, two sets of lethal-injection drugs, and an execution team that had participated in at least ten practice sessions per year. *Id.* at 55 (plurality opinion). The first two requirements would likely solve any problem resulting from an insufficient dose of sodium thiopental. *See id.* ("These redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line *before the last two drugs are injected*." (emphasis added)). At most, Appellees were on notice that properly

declaring the inmate unconscious had constitutional import. Because Appellees have violated no clearly established law, this claim fails.

Appellees point to *Hooper v. Jones*, 491 F. App'x 928, 930 (10th Cir. 2012) (unpublished), as proof that the Tenth Circuit had approved of Oklahoma's execution protocol. But that case is not precedential and has little persuasive value because its facts markedly differ from ours. Perhaps most importantly, Oklahoma was then using pentobarbital. In *Hooper*, we approved of Oklahoma's protocols, which did not require backup doses. But we found meritless the inmate's concerns about potential IV problems, partly because two IV lines were placed. *See id.* at 930 n.2. Thus, *Hooper* provides little help here, where midazolam was used and the execution's main flaw was using a single IV line and not checking that it was delivering the drugs into Lockett's system.

**8. Aggregate Eighth Amendment Claim**

Lockett's Estate argues that "[e]ven if none of Mr. Lockett's individual allegations rise to the level of misconduct required under the Eighth Amendment, the aggregate of these allegations amounts to an Eighth Amendment violation based on the totality of the circumstances." Appellant's Opening Br. at 28 (citation omitted). In support, Lockett's Estate cites to a Fourth Amendment case, *United States v. Arvizu*, 534 U.S. 266 (2002), an Eighth Amendment Excessive Fines Clause case, *United States v. One Parcel Property Located at Lot 85*, 100 F.3d 740 (10th Cir. 1996), and an Eighth Amendment prison-conditions case, *Clay v. Miller*, 626 F.2d 345 (4th Cir. 1980). Lockett's Estate provides us with no case suggesting that an

aggregate Eighth Amendment claim exists in this context. We decline to establish such a claim now. Because there is no clearly established law that Appellees could have violated, this claim fails.

**B. Procedural Due Process**

Lockett's Estate argues in its sixth claim that Lockett had a liberty interest[12] in the use of an ultrashort-acting barbiturate during his execution. Before November 2011, Oklahoma in fact required this. 22 Okla. Stat. § 1014(A) (2010). But in November 2011, the Oklahoma legislature amended the statute to instead require only "the administration of a lethal quantity of a drug or drugs." 22 Okla. Stat. § 1014(A) (2016).

"States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995). "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical

[12] Lockett's Estate also asserts a procedural-due-process violation based on a life interest. But the only supporting argument it offers is that "[i]t is probably that in the context of protecting a *life* interest under due process, as in this case, more robust procedural protections than those specified in [*Sandin v. Conner*, 515 U.S. 472 (1995)] might apply." Appellant's Opening Br. at 31 n.9. Lockett's Estate then notes that "this court doesn't need to reach that question because as explained above, even under *Sandin* the Appellant is entitled to reversal." *Id.* Because Lockett's Estate offers us nothing beyond the *Sandin* standard for liberty interests, we analyze that argument alone. Even if Lockett's Estate had presented this argument more thoroughly, we doubt that Lockett's Estate has pleaded a claim for deprivation of Lockett's life interest here—he was afforded due process, a jury trial and numerous appeals, before his execution.

and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484 (citations omitted).

As the district court discussed in its order dismissing Lockett's Estate's case, this sort of claim is potentially viable under *Pavatt v. Jones*, 627 F.3d 1336 (10th Cir. 2010). *See id.* at 1340–41. But we decided *Pavatt* under the previous version of section 1014(A), which, as noted, required an ultrashort-acting barbiturate. Whatever persuasive value *Pavatt* has is lessened by Oklahoma's having repealed this requirement before Lockett's execution. In addition, we are uncertain how *Sandin*'s "atypical and significant hardship" language would even fit in the execution realm. If it were an atypical and significant hardship to be executed without sodium thiopental, no further lethal-injection executions could happen since sodium thiopental is now unavailable. Additionally, a death sentence is by its nature an atypical and significant hardship. Regardless, even if Lockett's Estate could establish a liberty interest in the use of a certain category of execution drugs, any such interest was certainly not clearly established.

Nor did *Pavatt* reach the ultimate issue of whether the inmate had a liberty interest in an ultrashort-acting barbiturate being used. Nothing in the record indicated "that defendants ha[d] denied [the inmate] the opportunity to challenge the protocol either administratively or in the Oklahoma state courts." *Pavatt*, 627 F.3d at 1341. When we decided *Pavatt*, the inmate had three weeks until his execution date. *See id.* at 1337–38 (opinion published on December 14, 2010, and execution scheduled for January 4, 2011). Here, Lockett had two weeks. During that time, he was able to

obtain two opinions from the Oklahoma Supreme Court. *See Lockett v. Evans*, 356 P.3d 58 (Okla. 2014) (April 21); *Lockett v. Evans*, 330 P.3d 488 (Okla. 2014) (April 23). Because Lockett had the opportunity to exercise his Due Process rights to challenge the drug protocol and failed to do so, Lockett's Estate cannot now complain of a liberty-interest violation.

**C. Right to Counsel During an Execution**

Lockett's Estate attempts to assert a constitutional right to counsel throughout an execution. It asks this court to recognize a constitutional right to counsel "when an execution procedure is producing unexpected and painful results." Appellant's Opening Br. at 33 n.11. Lockett's Estate points to no law that would support a right to counsel throughout an execution, and we struggle to envision what such a right would look like in practice. Thus, Appellees have violated no clearly established law.

**D. Quasi-Judicial Immunity**

Dr. Doe also asserts that he is entitled to quasi-judicial immunity because Lockett's death sentence "was issued and carried out pursuant to statutes and judicial authority." Doe Resp. Br. at 31. Because we find that Dr. Doe is entitled to qualified immunity, we do not reach this argument.

**III. Conclusion**

For the reasons stated above, we affirm the district court.

No. 15-6134, *Estate of Clayton Lockett v. Fallin, et al.*

**MORITZ**, J., concurring.

I join much of the majority's well-reasoned opinion, including its ultimate decision to affirm the district court's dismissal of the Estate's complaint. *See* Maj. Op. 33. I write separately, however, because I question the accuracy of—or at the very least, the necessity of reaching—some of the majority's interim conclusions.

At the outset, I note that the majority commits to narrowly resolving the many qualified-immunity issues presented in this appeal by focusing, as the district court did, solely on the Estate's failure to show that defendants violated clearly established law. *See* Maj. Op. 11 (expressly "declin[ing] . . . to decide each of the constitutional-violation questions first"); Maj. Op. 9-10 (noting agreement with, and affirmance of, district court's dismissal based on failure to show defendants violated clearly established law). But as I read the majority opinion, it repeatedly, and in my view, unnecessarily, decides the constitutional questions. *See, e.g.* Maj. Op. 17 ("Lockett's suffering did not run afoul of the Eighth Amendment."); Maj. Op. 20 (suggesting repeated needle sticks would not violate Eighth Amendment); Maj. Op. 26 ("Thus, we conclude that Oklahoma's use of midazolam comports with the Eighth Amendment.").

As more fully discussed below, while I agree with the majority's professed intent to resolve the qualified immunity issues on the clearly-established prong, I do not agree with those portions of the opinion that conflict with that professed intent.

### 1. Defendants' Use of Midazolam

First, I respectfully part ways with my colleagues in evaluating whether defendants violated Lockett's constitutional rights by using a "[n]ew [d]rug [c]ombination." Maj. Op. 24 (addressing App. vol. 1, 163-165). In resolving what remains of this claim,[1] the majority affirmatively holds that "Oklahoma's use of midazolam comports with the Eighth Amendment." Maj. Op. 26. But I see no reason to reach this constitutional question. As I read its opening brief, the Estate has abandoned its general midazolam claim.

The Estate did allege below that defendants' general use of midazolam violated Lockett's Eighth Amendment rights. In support, the Estate asserted that midazolam is "incapable of producing a state of unawareness" and that "it cannot relieve pain."[2] App.

[1] As the majority correctly notes, the Estate's opening brief also alleges that defendants violated Lockett's Eighth Amendment rights by using compounded drugs. Aplt. Br. 24-26. But as the majority points out, the Estate has since withdrawn that allegation in light of defendants' statement that "no compounded drugs were used in Lockett's execution." Maj. Op. 4 n.1.

[2] The majority declines to accept these allegations as true, and therefore doesn't address them in analyzing this claim. Maj. Op. 6 n.5, 24-26. Again, while I wouldn't reach this abandoned claim, if I were to analyze it I would find the majority's analysis flawed and I would accept these allegations as true. According to the majority, "[a]sserting that midazolam is ineffective in rendering an inmate unconscious essentially asserts that the use of midazolam is constitutionally deficient, a legal conclusion that we need not credit." *Id.* at 6 n.5. I respectfully disagree. To be sure, the Estate's factual allegations about midazolam's efficacy may have legal *implications*—as all relevant factual allegations in a complaint surely must. But that doesn't necessarily make them legal conclusions. And nothing in *Zink v. Lombardi*, 783 F.3d 1089 (8th Cir.), *cert. denied*, 135 S. Ct. 2941 (2015), indicates otherwise. Contrary to the majority's suggestion, *see* Maj. Op. 6 n.5, the *Zink* court didn't refuse to accept as true plaintiffs' factual allegations about the potential risks of using compounded pentobarbital. *See* 783 F.3d at 1099-1103. It simply found those potential risks too hypothetical to demonstrate

vol. 1, 164. But on appeal, the Estate has pursued a much narrower course. Rather than arguing that defendants violated Lockett's Eighth Amendment rights by using midazolam generally, the Estate argues only that defendants violated Lockett's Eighth Amendment rights by using an *insufficient dosage* of midazolam. *See* Aplt. Br. 25.

It appears that the Estate strategically shifted its argument in an effort to distinguish this case from *Warner v. Gross*, 776 F.3d 721, 726, 736 (10th Cir.) (affirming district court's denial of preliminary injunction and denying plaintiffs' emergency motion for stay of execution despite Oklahoma's proposed use of midazolam as execution drug), *aff'd sub nom. Glossip v. Gross*, 135 S. Ct. 2726 (2015). In affirming this court's decision in *Warner*, the Supreme Court distinguished between Oklahoma's current execution protocol (which calls for 500 milligrams of midazolam) and the execution protocol in place when Oklahoma executed Lockett (which instead "called for the administration of 100 milligrams of midazolam"). *See Glossip*, 135 S. Ct. at 2734. Thus, the Estate argues on appeal, the district court erred in relying on our opinion in *Warner* "to justify its dismissal of [the Estate's] claim pertaining to . . . use of an insufficient level of" midazolam, as opposed to the use of midazolam generally. Aplt. Br. 26.

Whatever the Estate's motive for making this strategic switch, the result is clear: the Estate has abandoned its claim that defendants violated Lockett's Eighth Amendment rights by using midazolam in favor of an argument that defendants violated Lockett's Eighth Amendment rights by using an *insufficient amount* of midazolam. Accordingly, I

---

that the drug was "'*sure or very likely*' to cause serious harm or severe pain." *Id.* at 1101 (citation omitted).

would find the former argument waived and, unlike the majority, I would decline to address it.[3]

Moreover, I would decline to address the Estate's current formulation of this argument—i.e., that defendants violated Lockett's Eighth Amendment rights by using an *insufficient dosage* of midazolam—because the Estate didn't advance that argument below. Instead, the complaint asserts that midazolam is inherently incapable of "producing a state of unawareness" or of "reliev[ing] pain." App. vol. 1, 164 ("One of the characteristics of midazolam is that it cannot relieve pain."). But the complaint never suggests that midazolam's ability to produce unawareness or relieve pain varies depending on the dosage administered.

---

[3] Even if defendants' general-use-of-midazolam claim is properly before us, I question the majority's emphasis, in resolving that claim, on the Estate's failure to allege that defendants chose to use midazolam *in order to* inflict pain. *See* Maj. Op. 25-26 ("Oklahoma did not switch to midazolam in an effort to inflict additional pain. Thus, we conclude that Oklahoma's use of midazolam comports with the Eighth Amendment." (citing *Baze v. Rees*, 553 U.S. 35, 103 (2008) (Thomas, J., concurring))).

That intent to cause pain is an element of any successful method-of-execution claim was, of course, the view of two concurring Justices in *Baze*. *See* 553 U.S. at 94 (Thomas, J., concurring) ("A method of execution violates the Eighth Amendment only if it is deliberately designed to inflict pain."). But the controlling plurality opinion in *Baze* indicates that something less than the intentional infliction of pain may suffice, at least in the context of a pre-execution Eighth Amendment claim: a showing that a prison official is aware that the chosen execution method poses a "substantial risk of serious harm," but nevertheless adopts that method in the face of a known and feasible alternative that will significantly reduce that risk. *Id.* at 52 (plurality opinion) (citation and internal quotation marks omitted). *See Glossip*, 135 S. Ct. at 2738 n.2 (explaining that "THE CHIEF JUSTICE's opinion in *Baze* sets out the holding of the case," while only "Justices SCALIA and THOMAS took the broader position that a method of execution is consistent with the Eighth Amendment unless it is deliberately designed to inflict pain"). Accordingly, I question whether the Estate's failure to allege that defendants chose midazolam *in order to* cause Lockett's suffering is dispositive of this claim.

In fact, to the extent the complaint discusses the constitutional import of the dosage that defendants used in Lockett's execution at all, it suggests that the dosage was unconstitutionally high, not unconstitutionally low. *See, e.g.*, *id.* at 165 ("As used in the procedure the high dosage of midazolam carries a substantial risk of producing tonic-clonic seizures and convulsions."); ("There is a substantial risk of a paradoxical reaction when midazolam is administered in high doses to individuals with a history of aggression or impulsivity.").

Because the complaint neither explicitly asserts that the defendants violated Lockett's constitutional rights by administering an insufficient dosage of midazolam, nor contains factual allegations that would support such a claim, I would decline to consider whether defendants' failure to use a higher dosage of midazolam violated Lockett's Eighth Amendment rights. Accordingly, I do not join the portion of the majority opinion addressing the Estate's midazolam claim.

**2. Torture**

Likewise, I decline to join the portion of the majority opinion evaluating Lockett's torture claim. *See* Maj. Op. 14-18 (discussing App. vol. 1, 161-63). "[I]t is safe to affirm that punishments of torture" violate the Eighth Amendment. *Baze*, 553 U.S. at 48 (citation and internal quotation marks omitted). But the question here isn't whether, "as a broad general proposition," torture violates the Eighth Amendment. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation and internal quotation marks omitted). Rather, "[t]he dispositive question is 'whether the violative nature of [the defendants'] *particular* conduct is clearly established.'" *Id.* (citation omitted).

The Estate makes no effort to identify any "existing precedent" that might place the question of whether defendants' "*particular* conduct" in this case violated the Eighth Amendment's ban on torture "beyond debate." *Id.* (citation and internal quotation marks omitted). Instead, the Estate relies solely on "broad general proposition[s]." *Id.* (citation and internal quotation marks omitted). For instance, the Estate notes that the Eighth Amendment proscribes "torture[] and other barbar(ous) methods of punishment" and "the unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 102, 103 (1976) (citations and internal quotation marks omitted), and that "[p]unishments are cruel when they involve torture or a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890). *See* Aplt. Br. 15-17.

While it's true that there need not be a "case directly on point," the Supreme Court has repeatedly warned us "not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (citation and internal quotation marks omitted).[4] And that is precisely what the Estate's citations to *Estelle* and *Kemmler* invite us to do here. Because the Estate cites no authority that would have put defendants on notice that their *particular* conduct violated the Eighth Amendment's prohibition on torture, the Estate fails to satisfy the clearly-established prong of the qualified-immunity analysis. Accordingly, I would affirm the district court's conclusion that defendants are entitled to qualified immunity on the Estate's torture claim on that basis alone, without addressing

[4] *Mullenix* is a Fourth Amendment case, and the Court has explained that "specificity is especially important in [that] context." 136 S. Ct. at 308. Nevertheless, this court has applied the same specificity requirement in the Eighth Amendment context. *See, e.g.*, *Cox v. Glanz*, 800 F.3d 1231, 1245 n.6 (10th Cir. 2015); *Henderson*, 813 F.3d at 953.

whether defendants violated Lockett's Eighth Amendment right to be free from torture. I therefore do not join the portion of the majority opinion addressing the Estate's torture claim.

**3. Deliberate Indifference**

Similarly, while I agree with the majority that the language of the Estate's "torture" claim is broad enough to alternatively allege that defendants were deliberately indifferent to a risk of substantial harm, I would again find it unnecessary to resolve whether the Estate's allegations are sufficient to establish that defendants violated Lockett's constitutional rights. *See* Maj. Op. 14-18 (addressing App. vol. 1, 161-63).

In its opening brief, the Estate relies primarily on its allegations of repeated needle sticks to support this alternative theory. Aplt. Br. 18-20. But like the majority, I would decline to consider these allegations because (1) they don't appear in the complaint and (2) they are not subject to judicial notice. *See* Maj. Op. 18-19.

The only remaining factual allegation the Estate relies on in advancing this claim on appeal is its assertion that defendants obscured the injection site with a towel. Aplt. Br. 18. But even assuming that Lockett had a constitutional right to have defendants monitor the injection site for the duration of his execution, that right wasn't clearly established at the time. *See Henderson*, 813 F.3d at 953 (noting that while a case on point isn't required, existing precedent must place constitutional question beyond debate). Accordingly, I would affirm solely on that basis, without addressing whether defendants were deliberately indifferent to a "substantial risk of serious harm" in failing to monitor

the injection site. *See Baze*, 553 U.S. at 50 (citation and internal quotation marks omitted).[5]

Moreover, even if I reached the constitutional question, I would confine my analysis to the factual allegations that are properly before us. Because I agree that we shouldn't take judicial notice of facts that don't appear in the complaint, I would—unlike the majority—decline to speculate as to whether those same facts might establish an Eighth Amendment violation. *Compare* Maj. Op. 18 (declining to take judicial notice of Estate's allegation that defendants "repeatedly stab[bed]" Lockett with a needle), *with*

---

[5] The majority acknowledges that the Estate's first claim for relief is sufficient to allege deliberate indifference under *Baze*. *See* Rule 28(j) Letter, 1 (arguing that complaint asserts deliberate-indifference claim under *Baze*); Maj. Op. 15 (acknowledging letter and agreeing that complaint alleges deliberate-indifference claim). Yet—at least as far as I can tell—the majority neither discusses nor applies the *Baze* plurality's test for deliberate indifference in evaluating this claim. Instead, the majority opinion appears to suggest that because defendants didn't "place[] the IV or cover[] Lockett's groin area *to cause* Lockett pain," the Estate "has no claim for . . . deliberate indifference." Maj. Op.18. But as discussed above, *see supra* note 3, intent to inflict pain is not an element of a deliberate-indifference claim under *Baze*. *Compare Baze*, 553 U.S. at 94 (Thomas, J., concurring), with *Baze*, 553 U.S. at 49-52 (plurality opinion). This conclusion likewise calls into question the majority's treatment of the Estate's "[p]rolonged [e]xecution" claim. *See* Maj. Op. 23 (indicating that Supreme Court precedent "require[s] that executing officials *mean* to choose an execution method that will cause extra pain"); Maj. Op. 23 (citing *Baze* plurality's substantial-risk language, but nevertheless focusing on fact that "IV infiltration was . . . not something designed to cause additional pain"). Relatedly, I question the majority's suggestion that defendants weren't deliberately indifferent to Lockett's serious medical needs simply because they didn't "intentionally set the IV to collapse the vein to cause Lockett's suffering." Maj. Op. 21. True, "deliberate indifference entails something more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). But "the cases are . . . clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm." *Id.*

Maj. Op. 20 (nevertheless opining, "[W]e doubt that attempting to place an IV for an hour would violate the Eighth Amendment under *Baze*").

Finally, even if I were to consider whether repeated needle sticks amount to a constitutional violation, I question whether *Baze* would necessarily resolve the matter, as the majority suggests. *See* Maj. Op. 20 (describing *Baze* as "finding no violation where the execution protocol allowed the IV team one hour to establish an IV"). In *Baze*, the plurality rejected the petitioners' assertion that that using an IV inserted after "more than ten or fifteen minutes of unsuccessful attempts is dangerous because the IV is almost certain to be unreliable." 553 U.S. at 55 (plurality opinion) (citation and internal quotation marks omitted). The *Baze* plurality didn't address whether—as the Estate alleges here, *see* Aplt. Br. 17-20—repeated needle sticks *in and of themselves* might at some point raise constitutional concerns.

**4. Oklahoma's Revised Execution Protocol**

As a final matter, I am puzzled by the majority's repeated references to Oklahoma's recent efforts to revise its execution protocol. *See, e.g.*, Maj. Op. at 23-24, 24 n.11 (noting that "[b]ecause Oklahoma has changed its execution protocol," this court will likely "never confront another Oklahoma execution presenting the same circumstances"); Maj. Op. 27 ("And it's worth noting that Oklahoma has now adopted some [new] procedural measures.").

The question before us on appeal is whether defendants violated Lockett's clearly established constitutional rights. And Oklahoma's recent remedial efforts cannot retroactively influence the constitutional character of defendants' past actions.

Accordingly, Oklahoma's efforts to revise its execution protocol have played no role in my analysis of the legal issues in this case.